FOURNET, Justice
 

 (dissenting).
 

 I concur in the view of the majority opinion that Act No. 157 of 1940 is constitutional, but I must respectfully dissent from that portion of the opinion holding Order No. 28-B of the Commissioner of Conservation to be legal and valid. It is my opinion that in issuing this order the Commissioner of Conservation exceeded the authority given him in Section 8(b) of Act No. 157 of 1940.
 

 I am in full accord with the well-established principle of law that the legislative branch of the government may delegate to other governmental agencies the power and authority to determine under what facts, conditions, and circumstances certain laws are to be applied and enforced where the pattern or plan controlling and limiting the discretion thus vested in such agency is also laid down by the legislative body. But there is an equally well-established corollary to this rule, and that is that such delegated authority ceases to be legal when the person or agency in which it has been reposed exercises ' it in an arbitrary and discriminatory manner.
 

 The Constitution of 1921 very plainly states, that the Department of Conservation is created for the sole purpose of protecting, conserving, and replenishing the natural resources of the state. The authority given the legislature to enact laws with respect to the Department of Conservation is limited to those that are necessary for the protection, conservation,, and replenishment of the natural resources of the state “and to prohibit and prevent the waste or any wasteful use thereof.” The Department of Conservation is placed under the direction and control of the Commissioner of Conservation and he has only “such authority and power as may be prescribed by law.” Section 1 of Article VI of the Constitution of 1921.
 

 As expressed in its title, Act No. 157 of 1940 was enacted “to conserve the oil and gas resources of the State of Louisiana; to prevent waste and depletion thereof.” In other words, this act was enacted for the sole purpose of conserving our oil and gas resources by preventing their waste and depletion. This is emphasized in Section 1 where it is declared that “waste of oil and gas as defined in this Act is hereby prohibited.” The authority of the Commissioner of Conservation to establish a drilling unit or units for each of the pools in the state is specifically limited in Section 8(b) to two instances, viz.: (1) where it is for the purpose of preventing waste, and (2) where it is for the purpose of avoiding the drilling of unnecessary wells.
 

 
 *148
 
 As I see it, the only questions to be answered are whether or not waste either exists or is imminent in the Logansport field and whether or not unnecessary wells are either being or are likely to be drilled in that field. If there is no waste and no
 
 unnecessary
 
 wells are being drilled, then the Commissioner of Conservation had absolutely no authority to unitize this field and his issuance of Order No. 28-B was so arbitrary and discriminatory as to render it null and void.
 

 I have carefully reviewed the entire record in this case and no where can I find any evidence to support the Commissioner’s action in issuing Order No. 28-B.
 

 The Jeter Horizon in the Logansport field is composed of some 25,000 acres, 60% of which lie in' Louisiana and the other 40% in Texas. It seems to be undisputed that this is one common reservoir or pool. At the time the hearings in this case were held, only .five wells had been drilled on 'the 15,000-odd acres lying in Louisiana.' While it is not clear from the evidence exactly how many wells had been drilled in the area lying in Texas at that time, nevertheless, there is evidence showing that as many as 4 wells had been drilled there on a 40-acre tract. (Tr. p. 155.) The first, or discovery well, was drilled on the Louisiana side by the Hunter Company, Inc., the plaintiff in this suit. It cost approximately $44,000 and was completed on June 1, 1938. At that time there was no market for the gas, so the plaintiff capped it. In 1940, having found a market, which was limited, it became necessary foi; the plaintiff to construct its own pipe line to transport this gas to the market. This pipe line cost approximately $12,000. It was not completed until January of 1941. From then until June of that year, the plaintiff continued to deliver the gas from its well through its own pipe line to the market it had found. It might be mentioned here that the amount sold by the plaintiff and thus delivered was not equal to the amount it was authorized to withdraw from the well by the Department of Conservation. In other words, it was not withdrawing every day the amount of gas considered by the Department of Conservation to be the right amount for the preservation of the underground common reservoir. It was at the instigation of the Southern Production Company, Inc., the owner of other wells in this field' and of extensive acreage in the immediate vicinity of the plaintiff’s well, that the hearings were held which led to the eventual adoption of Order No. 28-B. By this order the Logansport field was divided into drilling units of 320 acres. This meant that the development on the Louisiana side of the Jeter Horizon (as against the development on the Texas side, which in some instances amounted to 4 wells to a 40-acre tract) was limited to the drilling of only one well on every 320-acre tract of land in the field. Inasmuch as the tract on which the plaintiff had drilled its discovery well consisted of only 190 acres, it was compelled to tack on 130 acres of the surrounding acreage in order to make up the 320-acre tract, and its competitor thus became entitled to share to that extent in the gas sold by the Hunter Company, Inc., io its own market (and a
 
 *150
 
 very limited market at that) and transported through its own pipe lines.
 

 During the course of the hearings, a great deal of highly technical and scientific evidence was adduced in an effort to arrive at the number of acres one well can drain in the Logansport Field without any resulting material impairment to the reservoir supply. There was also a great deal said about waste — the kind of waste contemplated by the act, such as the excessive or improper use or dissipation of the gas in the common pool. If this evidence is carefully studied, however, it will be seen that no waste can occur in the Logansport Field unless
 
 unnecessary
 
 wells are drilled, for nowhere do we find any evidence to show there is a present waste in this field. There is certainly no surface waste, because all of the gas produced is being marketed. There is no underground waste because there is no evidence of any water problem in the field or of any channeling, coning or entrapment. The reasons given as to why waste will occur if unnecessary wells are drilled are numerous. In general it is because a large amount of gas is consumed as fuel in the drilling of new wells; because other large amounts are used when these new wells are permitted to “clean themselves out,” and besides, it is said that these wells are usually abandoned at a higher bottomhole pressure than when they are well spaced. Another reason is that when wells are spaced too close together there is an increased danger of “blow outs.” All of this evidence would have been of inestimable value to the Commissioner of Conservation had he been faced with the problem of deciding whether or not the field should be unitized to avoid the drilling of unnecessary wells. But no such problem confronted him. In a tract of some IS,000-odd acres, only five wells had been drilled in the three or four years that had elapsed since the field was first discovered. This was probably due to the fact that'the market for gas is very limited. What it amounts to is that there was actually no necessity for cluttering up the record with page after page of testimony tending to show the smallest number of acres that one well could drain without damage to the common pool. Because of the impossibility of securing drilling equipment in the present wap emergency, it is evident that no unnecessary wells will be drilled, at least for the duration. If this is so, then certainly there is no present danger that waste will result in this field from the most common source of waste, that is, the drilling of unnecessary wells. And since no waste is occurring from the wells already drilled in this field, the statement in Order No. 28-B that it was issued “as being reasonably necessary to conserve the gas resources of the State, to prevent waste thereof as defined by law, to avoid the drilling of unnecessary wells” is clearly unsound.
 

 To further illustrate the Commissioner’s lack of justification in issuing Order No. 28-B, let us consider the order itself. At the time this order was issued, only five wells had been completed on the Jeter Horizon, with no immediate prospect of any extensive additional drillings. By dividing the property into units of 320 acres and authorizing the drilling of one well on each such tract, the Commissioner, in effect, sanctioned the drilling of 42 addition
 
 *152
 
 al wells. In other words, he found from a review of all of the technical and scientific evidence adduced at the hearings that 47 wells could be drilling on this Jeter Horizon without there being any danger that the gas in the common reservoir would be wasted. He went even further than that. On page 3 of the order of September 5, 1941, he stated that if there were a sufficient market, he would reduce these units to 160 acres. In so doing he would sanction the drilling of a great many more than 47 wells on the Jeter Horizon. This was an admission by him that wells could be drilled to a density of one well to every 160 acres in the Logansport field without there being any danger of reservoir waste. This being so, it is perfectly obvious that to declare that the field must be unitized into units of 320 acres to prevent waste is utterly ridiculous, because now there is only one well to every 3,000 acres with the possibilities of the immediate drilling of the additional wells sanctioned by the order being very remote indeed.
 

 The power given the Commissioner of Conservation by Act No. 157 of 1940 is not that he may unitize fields where there is a
 
 possibility
 
 or
 
 probability
 
 that at some time in the future there will be a waste of one of the natural resources of oil or gas. If this is the case, then every field in the state should be unitized, for there is always that possibility or probability. Such danger must be existing or imminent, not speculative. If and when in the future waste occurs, or the possibility of the drilling of
 
 unnecessary
 
 wells is imminent, the Commissioner of Conservation will then be authorized to call another hearing and act in accordance with the facts presented. It is my opinion that there is nothing in the record to show that there is a present need for the unitization of the Logansport field.
 

 It is also interesting to note that of the eight gas fields in this state producing from the Jeter Horizon, the Logansport Field is the only one in which the provisions of Act No. 157 of 1940 are being enforced, and it is conceded that the order in controversy here would never have been issued if the Southern Production Company, Inc., had not provoked the same.
 

 Finding that the Commissioner of Con-' servation arbitrarily issued Order No. 28-B without there being any necessity therefor in fact, I must respectfully dissent from that portion of the majority opinion holding the order to be legal and valid.